# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CHAU B. TRAN AND JOHN GALLEGOS,** | 1:16-cv-249-LJO-SAB |
| **Plaintiffs,** | **MEMORANDUM DECISION AND ORDER RE DEFENDANT'S MOTION TO SEVER (Doc. 7)** |
| **v.** | |
| **MERCED IRRIGATION DISTRICT,** | |
| **Defendant.** | |

## I. PRELIMINARY STATEMENT TO PARTIES AND COUNSEL

Judges in the Eastern District of California carry the heaviest caseloads in the nation, and this Court is unable to devote inordinate time and resources to individual cases and matters. Given the shortage of district judges and staff, this Court addresses only the arguments, evidence, and matters necessary to reach the decision in this order. The parties and counsel are encouraged to contact the offices of United States Senators Feinstein and Boxer to address this Court's inability to accommodate the parties and this action. The parties are required to reconsider consent to conduct all further proceedings before a Magistrate Judge, whose schedules are far more realistic and accommodating to parties than that of U.S. Chief District Judge Lawrence J. O'Neill, who must prioritize criminal and older civil cases.

Civil trials set before Chief Judge O'Neill trail until he becomes available and are subject to suspension mid-trial to accommodate criminal matters. Civil trials are no longer reset to a later date if Chief Judge O'Neill is unavailable on the original date set for trial. Moreover, this Court's Fresno Division randomly and without advance notice reassigns civil actions to U.S. District Judges throughout

1

1   the nation to serve as visiting judges. In the absence of Magistrate Judge consent, this action is subject to

2   reassignment to a U.S. District Judge from inside or outside the Eastern District of California.

3                                              **II. INTRODUCTION**

4          Plaintiffs Chau B. Tran and John Gallegos bring various civil rights and employment claims

5   against their former employer, Defendant Merced Irrigation District ("MID"). MID moves to sever their

6   claims on the ground that Plaintiffs' individual claims should proceed in separate suits because of their

7   factual and legal differences. *See* Doc. 7-2 at 1-2.

8          The Court took the matter under submission on the papers pursuant to Local Rule 230(g). Doc.

9   13. For the following reasons, the Court GRANTS MID's motion.

10                          **III. FACTUAL AND PROCEDURAL BACKGROUND**[1]

11   **A.     Tran's Claims.**

12         Tran, who is of Vietnamese descent, is a former employee of MID. Doc. 1, Complaint

13   ("Compl.") at ¶ 10. MID hired Tran in October 2013 as an electrical engineer generally and a Manager

14   of Engineering and Operations specifically. *Id.* at ¶¶ 11, 19.[2] In that capacity, he had the responsibility to

15   develop, install, maintain, and operate safely MID's generating electricity at its hydroelectric power

16   plant and delivering electricity to its customers. *Id.* This required him to ensure that he and those he

17   supervised complied with federal and state laws, including the Occupational Safety and Health

18   Administration's ("OSHA") regulations. *Id.* "MID had a history of flaunting safety regulations which

19   Plaintiff Tran sough to correct due to his . . . job requirements of achieving and maintaining safe

20   working conditions." *Id.* at ¶ 29.

21

22   ───────────────

23   [1] For purposes of Defendant's motion to sever, the Court assumes the truth of the complaint's facts as alleged. *See Visendi*, 733 F.3d at 870. The Court notes at the outset that the factual allegations of Plaintiffs' complaint are riddled with grammatical errors, disorganized, and generally difficult to follow, which has hindered the Court's ability to understand the factual basis of Plaintiffs' claims.

24   [2] Plaintiffs' complaint contradictorily states Tran was hired in August 2013 and also "two or three months" after Gallegos

25   was hired in August 2013. *See* Compl. at ¶¶ 11, 51, 58. In their opposition, however, Plaintiffs clarify that MID hired Tran in October 2013. *See* Doc. 9 at 5.

For example, on December 10, 2013, Tran requested that MID order OSHA-required fire resistant ("FR") clothing to wear when accessing electric substations. *Id.* at ¶ 17. Tran claims that he sent this request to Don Ouchley, his supervisor, who immediately told Tran not to order the FR clothing without providing any reason. *Id.* Tran did not receive any FR clothing until March 2014, when he received a FR shirt, which he gave to an associate engineer, Andrew Crawford, who Tran supervised. *Id.* at ¶ 18.

Also in December 2013, Tran observed a lineman performing work on an electrical line without gloves, which Tran believed to be an OSHA violation. *Id.* at ¶ 29. Tran informed Ouchley with pictures of the perceived OSHA violation, but Ouchley ignored his concerns and told him not to visit "Castle Yard," where the violation occurred, because the mainly Caucasian linemen "do not like Plaintiff Tran being around watching them work." *Id.*

On June 10, 2014, after Ouchley saw the FR shirt in Crawford's office, he called Tran into his office and began to "demean and insult" Tran's intelligence for ordering the FRE shirt. *Id.* at ¶ 19. Ouchley told Tran that if he did not feel safe without the FR shirt in the substation, then he should not access the substation, even though Tran was required to do so to perform his job. *Id.* Tran claims that Ouchley "yelled at and scolded [him] . . . in front of other Caucasian employees for Tran's attempt to carry out his job in requir[ing] employees to adhere to OSHA mandated minimal safety requirements," specifically, wearing safety equipment. *Id.* at ¶ 20.

On June 11, 2014, Tran documented Ouchley's actions and filed a complaint with MID human resources ("HR"), who did not respond. *Id.* at ¶ 32. "As a result, Plaintiff Tran was disciplined in that he received a performance write-up on June 23, 2014." *Id.* at ¶ 21. Tran received a second performance write-up on July 14, 2015. *Id.* at ¶ 24.[3] Tran argues his evaluations were "not done by a single supervisor but by a general consensus of those who blatantly practiced racism and hostility towards Tran and other

---

[3] Tran does not allege the reason for or contents of this write-up.

1    minorities, specifically Don Ouchley, Jennifer Carter (who is head of MID's HR), and Dave Haubrich."

2    *Id.* at ¶ 40.

3        On July 28, 2014, Ouchley and other MID employees visited a substation without wearing a FR

4    shirt. *Id.* at ¶ 26. Because Tran considered doing so an OSHA violation, on August 4, 2014, he sent an

5    email to MID employees, including Ouchley, about OSHA requiring them to FR shirts when accessing

6    the substation. *Id.* at ¶ 27. Tran maintains that Ouchley refused to consider or discuss Tran's OSHA-

7    related concerns. *Id.* at ¶ 37. Rather, he and other MID employees, including Haubrich, demeaned Tran,

8    "claiming that [he] did not know what [he] was talking about." *Id.* at ¶ 38. Ouchley, Haubrich, and

9    others were resistant to Tran's authority as their supervisor and refused to follow his requests and

10   directives. *Id.* at ¶¶ 37-38. The hostility that Tran felt from MID employees made it "difficult if not

11   impossible" to perform his job correctly. *Id.* at ¶ 34.

12       Tran alleges that he was subjected to harassment and discrimination. Tran claims MID

13   employees Dave Haubrich and Sean Peck, both of whom are Tran's subordinates, made numerous racist

14   remarks while he was at MID. *Id.* at ¶ 33. On multiple occasions, Haubrich and Peck called Tran a "rice

15   farmer," "rice eater," "slant eyes," and "gook." *Id.* at ¶¶ 13, 33, 58. They also insulted Tran by mocking

16   Asian speech patterns, and by making "slant eyes" and "buck teeth." *Id.* at ¶¶ 14, 33, 58. Haubrich took

17   "demeaning photographs" of Tran, claimed "he was going to have fun with them," and circulated them

18   within the company without Tran's consent or knowledge. *Id.* at ¶ 59.

19       Tran also asserts MID employees routinely and blatantly displayed pornography at the

20   workplace. Tran alleges multiple MID employees would look at and discuss pornography with one

21   another, often in a demeaning manner. *Id.* at ¶¶ 41, 42, 45. Tran complained about these issues to Carter,

22   who took no action. *See id.* at ¶ 48.

23       MID terminated Tran on August 8, 2014. *Id.* at ¶ 49. MID's rationale for his termination was that

24   Tran, a non-native English speaker, had his family help him prepare work-related memoranda and

25   documents. *Id.* Tran, on the other hand, contends his termination was

4

1

> [i]n response to and in retaliation for presenting the complaints of a Hostile Work Environment
> due to racial slurs, racial profiling, demeaning comments and disempowering conduct by

2

> Caucasian employees, managers and superiors and pornography at the work site, and due to the
> low regard for minority workers, including attempts to insist on a safe working environment by a

3

> minority to the Caucasian staff.

4

*Id.* Tran claims that while terminating his position, Carter "admitted in writing that some of [his]

5

allegations of hostile work environment due to racism were true." *Id.* at ¶ 43.

6

**B.    Gallegos's Claims.**

7

MID hired Gallegos as a substation journeyman electrician on August 30, 2013. *Id.* at ¶¶ 51, 61.

8

Gallegos was supervised by and reported directly to Tran.

9

Gallegos is of Native American ancestry and "is brown skinned." *Id.* at ¶ 53. Gallegos claims

10

that MID employees, primarily Peck and Haubrich, his supervisor, called him "dirty Mexican,"

11

"wetback," and "illegal," believing he was of Mexican ancestry due to his appearance. *Id.* at ¶ 52. He

12

alleges MID employees stated things like "California should be given back to Mexico because there are

13

so many wetbacks here," *id.* at ¶¶ 53, 66, and sarcastically asked Gallegos to do rain dances. *Id.* at ¶ 66.

14

Haubrick also frequently made racist comments against other individuals to Gallegos, including Tran.

15

*Id.* at ¶ 58. Peck made repeated derogatory comments about minorities to Gallegos and was permitted to

16

wear Neo-Nazi emblems on his clothing and would "constantly flip open his knife" near Gallegos. *Id.* at

17

¶ 55. Various MID employees "fl[u]ng vulgarities aimed at minority neighborhoods regularly if not

18

daily." *Id.* at ¶ 66. At some point, Haubrich "staged photos of [Gallegsos's] trust and supposed safety

19

violations to falsely incriminate" him. *Id.* at ¶ 60.

20

Gallegos asserts MID employees also perceived Gallegos to be homosexual and discriminated

21

against him on that basis. *Id.* at ¶¶ 52, 57. Specifically, Peck, Bryan Brock, and Brandon Devine

22

pretended to be homosexual and to engage in oral and anal sex in front of MID employees. *Id.* at ¶ 57.

23

As with Tran, MID employees frequently viewed and discussed pornography while in Gallegos's

24

presence. *Id.* at ¶ 56.

25

MID employees regularly failed to inform Gallegos of scheduled meetings, moved or hid his

1   chair in the morning, and dismissed his safety concerns. *Id.* at ¶ 62. Gallegos asserts these actions were

2   to show him that he was unwelcome at MID. *Id.*

3          Gallegos eventually grew to fear for his health and safety because of his perceived racist and

4   homophobic co-workers. *Id.* at ¶ 55. Gallegos complained orally and in writing about his perceived

5   discrimination and the pornography at the workplace. *Id.* at ¶ 63. In addition, he complained of unsafe

6   working conditions. *Id.* Gallegos met with the head of MID's HR, Jennifer Carter, on July 1, 2014, and

7   discussed these concerns. *Id.* at ¶ 65. Gallegos lodged a formal written complaint, detailing his

8   perceptions of racism and retaliation, on July 15, 2014. *Id.* at ¶¶ 64-65. In August 2014, after

9   investigating Gallegos's complaints, HR concluded that it "appear[ed] that inappropriate behavior and

10  violations of company policy took place, specifically the Harassment/Discrimination/Retaliation Prevent

11  and Respectful Workplace policies," and that "appropriate action will be taken to ensure that such

12  conduct does not repeat itself." *Id.* at ¶ 67. "The level of hostility changed but continued with the full

13  knowledge of his superiors that Plaintiff John Gallegos had made such a complaint." *Id.* at ¶ 68.

14         Ouchley terminated Gallegos in October 2014, citing "unsafe work." *Id.* at ¶ 69. The

15  photographs that Haubrick allegedly staged were included in the packet explaining his termination. *Id.* at

16  ¶ 60.

17  **C.    Administrative complaints and this case.**

18         In May 2015, Plaintiffs complained to the Equal Employment Opportunity Commission ("the

19  EEOC"). *Id.* at ¶ 75. On December 17, 2015, the EEOC issued Plaintiffs a right to sue letter, permitting

20  Plaintiffs to file this case within 90 days.  *Id.* at ¶ 76. Likewise, in May 2015, Plaintiffs complained to

21  the California Department of Fair Employment and Housing, who issued them a right to sue letter. *Id.* at

22  ¶ 77.

23         Plaintiffs brought this case on February 22, 2016. Plaintiffs allege causes of action against MID

24  for:

25         1. Race ancestry, national origin and sex discrimination in violation of Title VII of the Civil

1    Rights Act of 1964, 42 U.S.C. § 2000(e) et seq. ("Title VII");
     2. Race and sexual discrimination in violation of California's Fair Employment and Housing Act
2    ("FEHA"),California Government Code § 12940(a);
     3. Retaliation for protected activity in violation of Title VII
3    4. Retaliation for protected activity in violation of Government Code § 12940(k);
     5. Failure to take all steps to prevent discrimination/retaliation in violation of Title VII
4    6. Failure to take all steps to prevent discrimination/retaliation in violation of California
     Government Code § 12940(k); and
5    7. Race discrimination in violation of 42 U.S.C. § 1981 et seq.

6    Plaintiffs' causes of action do not differentiate between Tran and Gallegos; the assertions are the same

7    for both Plaintiffs. The thrust of their claims is that MID is liable for: (1) its employees' discriminatory

8    acts; (2) its failure to take appropriate action in response to Plaintiffs' complaints; and (3) unlawfully

9    terminating Plaintiffs for discriminatory and retaliatory reasons.

10       MID now moves to sever Plaintiffs' claims, arguing that they are improperly joined under Rule

11   20(a). Doc. 7-2 at 1. MID argues "the only real similarity between the Plaintiffs' claims is that their

12   employment overlapped for about 11 months, that Plaintiffs allegedly are witnesses for each other, and

13   that Plaintiffs have sued [MID] under the same general theories of law." *Id.* MID therefore contends,

14   among other things, that Plaintiffs' claims do not arise out of the same transaction, occurrence, or series

15   of transactions or occurrences as required under Rule 20(a). *Id.*

16                    **IV. <u>STANDARD OF DECISION</u>**

17       Federal Rule of Civil Procedure[4] 20(a) "permits the joinder of plaintiffs in one action if: (1) the

18   plaintiffs assert any right to relief arising out of the same transaction, occurrence, or series of

19   transactions or occurrences; and (2) there are common questions of law or fact." *Coughlin v. Rogers*,

20   130 F.3d 1348, 1350 (9th Cir. 1997). "Rule 20 is designed to promote judicial economy, and reduce

21   inconvenience, delay, and added expense." *Id.* at 1351. Because "joinder of claims, parties, and

22   remedies is strongly encouraged," district courts should "entertain[] the broadest scope of action

23   consistent with fairness to the parties." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966).

24   _____

25   [4] All further references to the "Rules" are to the Federal Rules of Civil Procedure,

                                    7

But, even if Rule 20(a)'s requirements are met, the Court "must examine whether permissive joinder would comport with the principles of fundamental fairness or would result in prejudice to either side." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1296 (9th Cir. 2000) (citation and quotation marks omitted).

"If the test for permissive joinder is not satisfied, a court, in its discretion, may sever the misjoined parties, so long as no substantial right will be prejudiced by the severance." *Id.* A severed plaintiff will not suffer prejudice if free to pursue his or her claims individually. *Visendi v. Bank of America, N.A.*, 733 F.3d 863, 870 (9th Cir. 2013). If a case should be severed, "the court can generally dismiss all but the first named plaintiff without prejudice to the institution of new, separate lawsuits by the dropped plaintiffs against some or all of the present defendants based on the claim or claims attempted to be set forth in the present complaint." *Couglin*, 130 F.3d at 1350 (citation and quotation marks omitted).

## V. <u>ANALYSIS</u>

The first prong of the permissive joinder test, "the 'same transaction' requirement, refers to similarity in the factual background of a claim." *Coughlin*, 130 F.3d at 1350. More specifically, claims concern the same transaction or occurrence if they "arise out of a systematic pattern of events" and "have [a] very definite logical relationship." *Bautista v. Los Angeles Cty.*, 216 F.3d 837, 842-43 (9th Cir. 2000) (Reinhardt, J., concurring) (citations omitted). Conversely, claims that require "individualized attention" because they involve "different legal issues, standards, and procedures" do not arise out of the same transaction or occurrence. *Coughlin*, 130 F.3d at 1351.

Although there is some similarity between Plaintiffs' claims (namely, that Haubrich was the main source of the allegedly discriminatory conduct at MID), the underlying facts of their individual claims show that they are sufficiently distinct such that they should not be joined. First, Tran and Gallegos claim that the racist, demeaning, and hostile comments occurred "almost immediately" upon their respective arrivals at MID—which occurred two to three months apart. Gallegos alleges that these

1    comments occurred "sometimes daily," which suggests that Gallegos alleges he was subjected to months

2    of discriminatory comments before Tran even arrived at MID.

3          Second, Tran and Gallegos had different positions at MID. Tran held a managerial position and

4    oversaw a number of MID employees. Although Plaintiffs' complaint does not meaningfully describe

5    Gallegos's position, there is no suggestion that he had a supervisory role. Critically, Haubrich was

6    Gallegos's supervisor, but Tran's subordinate. This distinction is important because "[u]nder Title VII,

7    an employer's liability for . . . harassment may depend on the status of the harasser." *Vance v. Ball State*

8    *University*, 133 S.Ct. 2439 (2013). For instance, "[i]f the supervisor's harassment culminates in a

9    tangible employment action, the employer is strictly liable." *Id.* "[T]herefore, it matters whether a

10   harasser is a 'supervisor' or simply a co-worker" under Title VII, *id.*, as well as under FEHA. *See State*

11   *Dep't of Health Servs. v. Superior Court*, 31 Cal. 4th 1026, 1040-41 (2003) ("The FEHA imposes two

12   standards of employer liability for sexual harassment, depending on whether the person engaging in the

13   harassment is the victim's supervisor or a nonsupervisory co-employee."); *Doe v. Capital*, 50 Cal. App.

14   4th 1038, 1046 (1996) ("[California Government Code § 12940] has been interpreted to mean that the

15   employer is strictly liable for the harassing actions of its supervisors and agents . . . . Thus,

16   characterizing the employment status of the harasser is very significant.").

17         Third, although both Tran and Gallegos allege discrimination on the basis of their race and

18   national original, Gallegos also alleges discrimination on the basis of his perceived sexual orientation.

19   Specifically, he claims various MID employees—including Brock and Devine, who are not alleged to

20   have discriminated against Tran in any way—mimicked homosexual acts in front of Gallegos in an

21   offensive and demeaning way.

22         Fourth, the nature of the MID employees' allegedly discriminatory conduct toward Tran and

23   Gallegos differed. Although both Plaintiffs allege MID employees made racist comments repeatedly

24   without any ramifications, Tran and Gallegos assert the discrimination and hostility of those employees

25   manifested in other ways. Among other things, Tran claims his subordinates refused his directives

(namely, his request for adherence to safety standards) and questioned his authority, competence, and knowledge solely due to his race. Ouchley, his superior, allegedly undermined him. Gallegos, on the other hand, asserts MID employees made him feel not only unwelcome and discriminated against, but in physical danger.

Fifth, Tran's and Gallegos's interactions with MID's HR differed. Tran apparently made repeated complaints to HR about what he had experiences while at MID. In June 2014, Tran filed a formal written complaint about Ouchley with HR. None of his complaints received a response, though he claims Carter "admitted in writing" at the time of his termination that at least some of his complaints were true.

Gallegos also complained to HR orally and in writing. On July 1, 2014, Gallegos met with Carter to discuss his concerns and submitted a formal written complaint two weeks later. HR acknowledged what "was happening and promised to take proper action." Gallegos wrote a "follow up memo" on August 6, 2014, to which HR responded on August 11, 2014, explaining their conclusion that at least some of Gallegos's allegations were true and that "violations of company policy took place." Accordingly, HR ensured that "appropriate  action" would be taken in response. Afterwards, "[t]he level of hostility changed but continued."

Sixth, MID disciplined Tran and Gallegos in different ways, at different times, and for purportedly different reasons. On June 23, 2014, allegedly in response to his formal written complaint, Tran was disciplined by way of a performance "write-up." For unknown reasons, Tran received a second disciplinary write-up on July 14, 2014. MID terminated Tran on August 8, 2014, purportedly because his family members helped him with his written work product. Gallegos, on the other hand, never received a performance write-up. There is no indication that he was disciplined in any way until his October 6, 2014 termination, which occurred purportedly because of "unsafe work."

There are some similarities between Plaintiffs' claims, namely, that Plaintiffs allegedly suffered racial discrimination at the MID workplace, Haubrich is alleged to be the primary offender, and MID

allegedly condoned or turned a blind eye to the discrimination. But there are far more differences between Plaintiffs' claims. Although Haubrich allegedly discriminated against both Plaintiffs, Plaintiffs contend other MID employees did so as well on an almost daily basis over the course of their months-long employment at MID, often times for different reasons and in a different manner than did Haubrich.

Distilled, "Plaintiffs merely allege that [MID] violated the same laws in comparable ways. Rule 20(a) requires more." *Visendi*, 733 F.3d at 870 (citation omitted). Determining which MID employees allegedly discriminated against Plaintiffs, where, when, how, and why they did so, and assessing whether their conduct was unlawful will require the Court's "individualized attention" and will "involve[] different legal issues, standards, and procedures." *Coughlin*, 130 F.3d at 1351. Plaintiffs' claims therefore are improperly joined under Rule 20(a) because they do not arise out of the same transaction, occurrence, or series of transactions or occurrences. *Id.* Accordingly, the Court GRANTS MID's motion to sever.

## VI. CONCLUSION AND ORDER

For the foregoing reasons, the Court GRANTS MID's motion to sever (Doc. 7). The Court SEVERS and DISMISSES Gallegos's claims from this case without prejudice. Gallegos is free to file a new, separate lawsuit. *See Coughlin*, 130 F.3d at 1351.


IT IS SO ORDERED.

Dated:  __May 26, 2016__            _____/s/ Lawrence J. O'Neill_____
                                    UNITED STATES CHIEF DISTRICT JUDGE